Fabricant, Judith, J.
This action arises from a dispute between plaintiffs Christopher and Mairead Downey, defendant Chutehall Construction Co. Ltd. (Chutehall), and third-party defendant The Follett Company, Inc. (Follett), regarding the installation of a rubber roof system on the Downeys’ residence in 2005. Before the Court are each party’s motion for summary judgment and related motions to strike and to supplement the record. For reasons that will be explained, the Downeys’ and Chutehall’s summary judgment motions will be denied, and Follett’s motion will be allowed.
BACKGROUND
The summary judgment record establishes the following facts as undisputed, except as indicated.[1] Christopher and his wife Mairead Downey own a home in the Beacon Hill neighborhood of Boston. Sometime in 2004, the Downeys noticed a water stain on the ceiling of their fourth-floor bedroom. In or about September 2004, James Chute of Chutehall and Mr. Downey met to discuss the Downeys’ roof; they offer *404 varying versions of that conversation. As a result of that conversation, Chutehall submitted a written proposal to the Downeys, on Chutehall’s form, which described the proposed work as follows:
1. Supply, install & remove access scaffolding.
2. Remove & dispose of existing deck.
3. Strip off & dispose of existing roof system.
4. Supply & install a new fully adhered .060 EPDM rubber roofing membrane on 1 in. mechanically fastened “ISO” recovery board, including copper flashings & drip edges, termination bar, pipe boots, lap caulk seams etc.
5. Replace the deck, including P.T. sub framing, mahogany decking, and iron hand rail.
Next to each item was an estimated price. The proposal form stated, “All work to be completed in a professional manner according to standard practices. Any alteration or deviation from above specifications involving extra costs will be executed only upon written orders, and will become an extra charge over and above the estimate.” Christopher Downey signed the form, accepting the proposal, on June 13, 2005.
Chutehall proceeded with roofing work on the Downeys’ house in June or July 2005. It did not strip off and remove the existing roof, as proposed; instead, it laid the new roof on top of the old. How and why that occurred is a matter of dispute between the parties. According to Chute’s deposition testimony, Downey told him that the roof had been stripped 10 to 12 years earlier, so that it had only one roofing layer. Downey also, according to Chute, prohibited Chutehall from stripping the existing roof, or even making test cuts in it to determine how many layers existed. Downey denies having made any such statements, and denies having done anything to prevent Chutehall from stripping the existing roof.
At the completion of its work in July 2005, Chutehall sent the Downeys a document entitled “Application for Payment,” which listed the completed work, with an amount for each item:
1. Supply and install scaffolding.
2. Remove and dispose of existing deck.
3. Strip & slit existing roof system for ventilition [sic], install pressure treated sleepers to support new deck & drip edges, dispose of debris.
4. Supply and install new rubber roof.
5. Replace deck and hand rail etc.
Additional cost of hand rail over and above that allowed for in our proposal (40ft @ $55.00. v. 56ft @ $70.00./ft. [sic].
The total amount claimed corresponded to the amount set forth in the original proposal, plus the additional amount indicated for the handrail that had not been included in the original proposal.
Shortly after Chutehall completed its job, the Downeys again noticed a water stain on the ceiling in the fourth-floor bedroom. They notified Chutehall. Attributing the stain to a blocked gutter, Chutehall cleared the gutter. The stain nevertheless continued to grow, according to the Downeys, but they did not so inform Chutehall. The Downeys paid Chutehall’s bill in October 2005.
Four years later, in the summer of 2009, the Downeys sought to install an HVAC unit in an area over the fourth-floor bedroom. The Downeys’ contractor, John Canavan, cut a hole in the roof to install the HVAC unit, and noticed, according to his deposition testimony, that the roof insulation was wet. On Canavan’s suggestion, the Downeys engaged Follett and J.M. Lydon Corp. (Lydon), both roofing contractors, to inspect the roof.
Follett performed test cuts, and submitted a report to the Downeys dated August 11, 2009. The Follett report stated, in its entirety:[2]
1. The flat roof system consist of 4 different roof systems. There are 2 tar and gravel roof and 2 EPDM roofs. The top roof consist [sic] of .060 EPDM fully adhered to isosuranurate insulation. This roof was installed over a EPDM roof system that had. fiberboard roof insulation that was soaking wet The wet insulation will cause the newer roof system to fail. When the new roofs insulation is secured the screw penetrate the secondary EPDM roof and allow the water to infiltrate the new roof system. Also wetness around securement screws and heat from the summer will cause the screws to back out and puncture the new roof system.
2. Because of the wetness of the existing roof there will problems [sic] under the wood deck. The weight of the wood deck over a wet roof system will eventually compress the area under its supports and puncture the roof system.
We recommend removing all the roof systems in their entirety so as to expose the wood substrate. After this is completed a new EPDM roof can be installed in a clean, diy and correct manor.
Lydon provided the Downeys with a written proposal for installation of a new roof. That document included the following:
Existing surface has three different roofs the first one being a three/four ply asphalt roof mopped directly to wood deck, the second one is a EPDM roof on half inch fibreboard [sic] which is saturated and the top one being EPDM over one inch polyisocyanurate insulation. This roof would be adequate if it was not installed over a wet roof It has a leak at base of roof access stair enclosure were roof membrane was installed over metal panels.
(Emphasis added.) Lydon’s second affidavit clarifies that he made observations of an area of the roof that had been opened by the contractor, “including saturated fibreboard under a secondary roofing layer of EPDM, which was under the top roof layer of EPDM over one *405 inch polyisocyanurate insulation." He goes on, “I was not looking for the source of the water saturating the fibreboard ... I was only describing my observations that day. I do not know when or how the fibreboard became wet ... I was not suggesting that whoever installed the top roof layer did so over wet fibreboard.”
After receiving these reports from Lydon and Follett, Christopher Downey consulted an attorney. On advice of the attorney, he sought an opinion from an engineering firm, Simpson, Gumpertz and Heger (SGH). In an email to SGH dated August 6, 2009, Downey commented, “I will have to go after the original contactor [sic] for some sort of refund and [the attorney] thought your opinion of the roof might be useful.”
Engineer Gregory R. Doelp of SGH examined the roof, and provided comments in an email to Downey dated September 16, 2009, in which he stated:
Both proposals correctly point out that the existing roofing system contains multiple roofs (4 or more). This is a building code violation (ho more than 2 roofs are allowed) and this may be overloading the existing roof structure already. All of the existing roofing systems should be removed down to the structural roof deck... Under no circumstances should another roof be placed over the existing roofing systems.
At his deposition, Doelp testified that “it looked to me as if the water had been there for years,” because of the extent of the saturation and the presence of mold. Nevertheless, he had no opinion whether Chutehall had installed the roof over wet insulation, and he acknowledged various possible sources of the wetness unrelated to Chutehall’s work. When asked whether roofs with multiple layers tend to leak more than roofs without multiple layers, Doelp replied:
[T]here are some circumstances where having multiple roofs can increase the likelihood of roof problems that leads to leakage. That’s not the case in eveiy roof. There are some roofs where you can have multiple layers of roofing and it doesn’t actually contribute to leakage in the primary roof system. Again, it depends upon the particular application.
In October 2009, the Downeys hired Follett to remove and replace the existing roof system at a cost of $27,850. Although, as indicated supra, the Downeys had already formed the intention to assert a claim against Chutehall, they did not contact Chutehall before Follett performed the work. Thus, Chutehall did not have an opportunity to examine the roof before it was removed and discarded. In December 2009, the Downeys hired Canavan Construction to rebuild the roof deck, at a cost of $15,000.
The Downeys first notified Chutehall of their claim in a demand letter from Mr. Downey, dated May 4, 2010. The letter asserted that, although the Downeys had seen water staining within a year of Chutehall’s work, “we checked our gutters and windows and left it at that.” Then, however, “during another project in the summer of 2009, the Follett Company, Inc. noted that the roofing workmanship was in fact poor and substandard' (emphasis added). Enclosing a copy of Follett’s report, the letter asserted:
[W]e were left with four different roof systems ... this is a building code violation, as the code allows no more that [sic] two roofs. Chutehall installed the top EPDM roof... over an EPDM roof system that had fiberboard roof insulation which was soaking wet . . . roofing failure results because such an installation leads to a wet roof system. Further, the wetness of the roof causes problems under the wood deck, as the weight of the deck over a wet roof system compresses the area and punctures the roof system.
The letter also enclosed the email from SGH, in which, as described in the demand letter, Doelp “agreed that the four-roof installation performed by your company was a building code violation which was overloading the existing roof structure, and that all existing roofing systems should be removed down to the structural roof deck.” The letter demanded that Chutehall pay the Downeys $37,800, the cost of the new roof installed by Follett and the new deck installed by Canavan. Chutehall replied by letter from its counsel, dated on May 28, 2011, denying any substandard performance, and asserting that Chutehall followed Mr. Downey’s instructions throughout the project.
The Downeys filed this action on September 9, 2011. They assert three counts against Chutehall: negligence (Count I); breach of contract (Count II); and violation of G.L.c. 93A by virtue of violation of G.L.c. 142A, §17(10) (prohibiting home improvement contractors from violation of the building laws of the Commonwealth) (Count III). Chutehall, in response, has filed a counterclaim against the Downeys for abuse of process.[3] Chutehall has also asserted a third-party claim against Follett, alleging defamation based on Follett’s statement in its report that the roof “was installed over a EPDM roof system that had fiberboard roof insulation that was soaking wet,” and the statement attributed to Follett in Mr. Downey’s demand letter, “that the roofing workmanship was in fact poor and substandard.” All parties have moved for summary judgment.
DISCUSSION
The Court grants summary judgment when the record establishes that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); see Community National Bank v. Dawes, 369 Mass. 550, 553 (1976). A fact is material if it would affect the outcome of the case. Carey v. New England Organ Bank, 446 Mass. 270, 278 (2006). A dispute of fact is genuine if the record, viewed in the light most favorable to the nonmoving party, could lead a rational trier of fact to find for the nonmoving party. Brooks v. Peabody & Arnold, LLP, 71 Mass.App.Ct. 46, 50 (2008); Cole v. New England Mut. Life Ins. Co., 49 Mass.App.Ct. 296, 298 (2000). The moving party bears the burden of affirmatively demonstrating that no gen *406 uine issue of fact exists. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may meet that burden by showing an absence of proof concerning an essential element of the non-moving party’s case. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991). Once the moving party demonstrates the absence of a triable issue, the non-moving party must establish the existence of a genuine dispute. Pederson, 404 Mass. at 17.
1. The Downeys’ Motion for Summary Judgment
The Downeys contend that the summary judgment record establishes as undisputed that Chutehall laid the new roof over two previous layers, in violation of the building code. That conduct, the Downeys contend, was a per se violation of G.L.c. 142A, §17(10) and c. 93A, and also establishes Chutehall’s negligence and failure to perform its work in “a professional manner according to standard practices,” as provided in its contract.
The Massachusetts building code prohibits installation of a new roof over an existing roof “(w]here the existing roof has two or more applications of any type of roof covering.” 780 C.M.R. §1512.3 (as in effect in 2005, now 780 C.M.R. §1510.3). The building code is a “building law” for purposes of G.L.c. 142A. See Reddish v. Bowen, 66 Mass.App.Ct. 621, 628 (2006). Thus, a- contractor’s knowing or intentional installation of a roof over two or more existing layers is a violation of that statute, and thereby a violation of G.L.c. 93A. The evidence the Downeys offer, particularly the deposition testimony of Follett and Doelp and the Lydon affidavits, in the absence of any contrary evidence, suffices to establish that, as of the time they inspected the roof, it had four layers. In the absence of evidence of any intervening installation, that evidence supports the inference that that Chutehall installed its roof over two pre-existing layers.
It does not necessarily follow, however, that Chutehall did so intentionally, nor does it follow that its conduct caused any harm to the Downeys. The evidence Chutehall offers, considered in the light most favorable to it, would support a finding that Chutehall acted in reasonable reliance on Downey’s erroneous representation that the roof had been stripped 10 to 12 years earlier, and only one layer existed, and on instructions from Mr. Downey not to strip the roof or make test cuts. Based on those findings, a juiy could reject the claim of liability against Chutehall on both the statutory and common law counts. See Reddish v. Bowen, 66 Mass.App.Ct. at 625 n.10.
Moreover, even if a breach were established, the record leaves entirely unclear whether the breach caused any harm to the Downeys. See DiMarzo v. American Mut. Ins. Co., 389 Mass. 85, 101 (1983) (the existence of a causal connection is a question of fact); Kohl v. Silver Lake Motors, Inc., 369 Mass. 795, 800-01 (1976) (plaintiff must prove causal connection between breach and injury); Thurlow v. Town of Provincetown, 337 Mass. 450, 453-54 (1958) (same). The testimony of Gregory Doelp, quoted supra, indicates that installation of a roof over multiple pre-existing layers would not necessarily cause leakage. The Downeys have offered no expert opinion to indicate that it did so in this case, nor have they offered anything to indicate that the building suffered any structural damage as a result of the number of roof layers. A jury could, perhaps, infer a causal relationship between the number of layers and the leakage, based on the sequence of events, but the record hardly compels that inference. Overall, the Court concludes that the record reveals genuine disputes of fact that are material to the Downeys’ claims, and that preclude summary judgment in their favor.[4]
2. Chutehall’s Motion for Summary Judgment.
Chutehall’s motion for summary judgment rests primarily on its contention that the Downeys’ claims are barred by the statute of limitations. Count I of the Downeys’ complaint, as the parties agree, is subject to the three-year limitations period for tort claims under G.L.c. 260, §2B. White v. Peabody Construction Co., Inc., 386 Mass. 121, 128 (1982). Count II alleges that Chutehall failed to fulfill its contractual obligation to perform the work “in a professional manner according to standard practices." That claim, although cast as one of breach of contract, is in substance a claim of negligence, and is therefore also subject to the three-year statute of limitations for tort claims. See Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 395-96 (2003) (negligence in the manner of performance is distinct from failure to perform, which is a contract claim); Oliveira v. Pereira, 414 Mass. 66, 72 (1992) (to determine whether the contract or tort statute of limitations applies, the Court must look at the “essential nature of a party’s claim”); Fall River Hous. Auth. v. H.V. Collins Co., 414 Mass. 10, 15 n.6 (1992) (a party cannot escape the statute of limitations on a tort claim simply by labeling it a contract claim). Count III of the Downeys’ complaint, alleging violation of G.L.c. 93A, is subject to a four-year limitations period under G.L.c. 260, §5A.
The limitations period for both tort and c. 93A claims begins to run when a plaintiff knows or reasonably should know of the injury. See Hanson Hous. Auth. v. Dryvit System Inc., 29 Mass.App.Ct. 440, 447 (1990); Hendrickson v. Sears, 365 Mass. 83, 89 (1974). On a motion for summary judgment based on a statute of limitations defense, the moving party must establish that the time period between the injury and the complaint exceeds the applicable limitations period. If the moving party does so, the non-moving party may defeat the motion by offering evidence sufficient to support a finding that the discovery rule tolls the limitations period. McGuinness v. Cotter, 412 Mass. 617, 620 (1992).
Here, the alleged breach — the installation of the new roof over more than one layer of pre-existing roof — occurred in July of 2005. There is evidence indicating that somedegree ofinjury, and notice of injury, occurred soon thereafter, in the form of continued visible leaking. The plaintiffs waited to sue until July 2, 2010, five years after *407 the work was performed, and nearly five years after they observed leaking. Those facts provide a strong basis to conclude that all the claims are barred by the applicable statutes of limitations.
The Downeys nevertheless contend that they could not have reasonably discovered the injury until 2009, when Canavan cut into the roof and exposed the wet insulation underneath, along with the multiple layers. As to the ceiling stains that appeared soon after Chutehall completed its work, the Downeys offer evidence that they relied on Chutehall’s determination that it resulted from a clogged gutter. Considering that evidence in the light most favorable to the Downeys as the non-moving party, the Court concludes that a reasonable factfinder could accept the Downeys’ position, and find that they were not on notice of the injury until Canavan performed his work in 2009. Accordingly, Chutehall’s statute of limitations defense presents a genuine dispute of material fact for trial.
Chutehall also contends that the Downeys lack evidence to prove a causal relationship between its conduct and any injury. As discussed supra, in connection with the Downeys’ motion, the Court views this as an issue of fact for trial. The evidence the Downeys offer hardly compels a finding of causation; indeed, Doelp’s testimony tends to undermine their theory. Nevertheless, in the Court’s view, the evidence offered, and inferences a jury might fairly draw, would support a finding that the installation over pre-existing layers created a hazardous situation that a reasonably prudent homeowner would remedy by the installation of a new roof.
Chutehall’s final theory is that the Downeys’ claim should be dismissed as a sanction for their spoliation of evidence, in causing the roof to be removed and destroyed without giving Chutehall an opportunity to examine it. Spoliation is the negligent or intentional loss or destruction of evidence, which the litigant knew or should have known might be relevant to a possible action. Keene v. Brigham and Women’s Hospital Inc., 439 Mass. 223, 234 (2003); see Kippenhan v. Chaulk Services., Inc., 428 Mass. 124, 127, 128 (1998). Where a Court finds spoliation, it has discretion to impose an appropriate sanction, tailored to avoid or remedy any unfair prejudice to the party who is deprived of access to the evidence. Wiedmann v. The Bradford Group, Inc., 444 Mass. 698, 705-06 (2005). “(A]s a general rule, a judge should impose the least severe sanction necessary to remedy the prejudice to the nonspoliating party.” Keene, 439 Mass. at 235.
Here, as indicated supra, the Downeys had formed the intent to make a claim against Chutehall, and had consulted a lawyer about that claim, before they had the roof removed. They nevertheless proceeded, without giving Chutehall any notice or opportunity to examine the roof. As a result, Chutehall can neither confirm nor refute the evidence the Downeys offer regarding the number of layers. The facts thus establish spoliation, along with prejudice to Chutehall. The Court is not persuaded, however, that dismissal is the appropriate sanction. Although charged with notice of their obligations as a matter of law, the Downeys may well not have recognized, as a matter of fact, that removal and disposal of the roof would prejudice Chutehall’s defense. Nor is there any basis to attribute to the Downeys any intention to achieve that result, or any other indication of bad faith. On the facts presented, in the Court’s view, the more appropriate sanction would be an instruction to the jury at trial that it may draw an adverse inference from the Downeys’ conduct. Accordingly, Chutehall’s motion for summary judgment will be denied.
3. Follett’s Motion for Summary Judgment.
Chutehall’s third-pariy claim against Follett asserts defamation, and violation of G.L.c. 93A based on the same conduct. Follett seeks summary judgment on the grounds that Chutehall lacks evidence to prove the elements of its claim, and further, that any statement it made regarding Chutehall was privileged. The Court agrees with both points.
To prove defamation, a plaintiff must show that the defendant published a false and defamatory statement of fact (as opposed to opinion), of and concerning the plaintiff; that the defendant was at fault in making the statement; and that the plaintiff suffered damages as a result. Phelan v. May Department Stores Co., 443 Mass. 52, 55-56 (2004); Correllas v. Viveiros, 410 Mass. 314, 319 (1991); McAvoy v. Shufrin, 401 Mass. 593, 597 (1988); Fahy v. Melrose Free Press, 298 Mass. 267, 269 (1937). A statement concerns a plaintiff if the defendant intended its words to refer to the plaintiff, and those words could reasonably be interpreted to refer to the plaintiff. New England Tractor-Trailer Training of Connecticut, Inc. v. Globe Newspaper Co., 395 Mass. 471, 480 (1985). Where the plaintiff is not a public figure, the standard of fault is negligence. See Jones v. Taibbi, 400 Mass. 786, 797 (1987).
Here, the only statement made by Follett that might reasonably be construed as concerning Chutehall is the statement in Follett’s report that “[t]his roof was installed over a EPDM roof system that had fiberboard roof insulation that was soaking wet.”[5] Although the statement does not mention Chutehall, a reader knowledgeable of the surrounding circumstances could reasonably understand it as asserting that Chutehall installed its roof over wet insulation, and that such conduct was below the standard of performance-reasonably to be expected of a contractor performing roofing work. Such an assertion would fairly be expected to cause damage to the contractor’s reputation.
The statement is actionable, however, only if it is one of fact, rather than opinion. “In deciding whether statements can be understood reasonably as fact or opinion the test to be applied... requires that the court examine the statement in its totality in the context in which it was uttered or published.” Fleming v. Benzaquin, 390 Mass. 175, 180 (1983) (internal quotations omitted). In the *408 factual context presented, a reader of Follett’s report would necessarily understand that Follett had no personal knowledge of whether Chutehall did or did not install the roof over wet insulation; Follett was not present when Chutehall did its work, and its report does not suggest that it was. Follett’s statement, made four years after Chutehall performed its work, can reasonably be understood only as an expression of Follett’s professional judgment, based on its observations at the time it examined the roof. However accurate or inaccurate Follett’s judgment may have been, nothing in the.evidence suggests that its report did not reflect its honest judgment.
Moreover, even if the statement could fairly be characterized as one of fact, nothing in the evidence would support a finding that Follett made it negligently. In a defamation claim against a private individual, there can be no liability without negligence. New England Tractor-Trailer Training of Connecticut, Inc., 395 Mass. at 479. To prove negligence, Chutehall would have to show that Follett failed to ascertain whether the statement was true or false before publishing it. Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 859 n.7 (1975). The evidence presented here indicates only that Follett made numerous test cuts in the roof, examined the layers underneath, and exercised its professional judgment to form a conclusion. Nothing offered by Chutehall would provide any basis for a jury to conclude that, in forming the conclusion it did, Follett acted unreasonably in any respect.
Even if the evidence would support the elements of defamation, Follett could have no liability if its statement was privileged. A conditional privilege exists when the communication is of a kind reasonably calculated to protect and further a common interest between the maker and the recipient of the statement. Sheehan v. Tobin, 326 Mass. 185, 190-91 (1950). The privilege applies when “the circumstances lead anyone . . . having a common interest in a particular subject matter ... to believe that there is information that another sharing the common interest is entitled to know.” Restatement (Second) Torts §596.
Here, the Downeys hired Follett to examine the roof and provide information and opinions about the nature and source of its condition. That relationship gave rise to a common interest between Follett and the Downeys. Follett supplied the requested information and opinions, in the form of a report provided to the Downeys, and only to them. These facts, in the Court’s view, compel the conclusion that Follett’s statement was made in furtherance of its and the Downeys’ common interest in evaluation of the roof, and was therefore conditionally privileged. Chutehall has offered nothing to defeat the privilege, by showing that Follett acted with malice, or that it disseminated its statement beyond the Downeys.
The Court therefore concludes that Follett is entitled to judgment as a matter of law on the claim of defamation. Since Chutehall’s claim under c. 93A rests entirely on the allegation of defamation, it must fall as well. See Dulgarian v. Stone, 420 Mass. 843, 853 (1995) (“where allegedly defamatory statements do not support a cause of action for defamation, they also do not support a cause of action under G.L.c. 93A”).
CONCLUSION AND ORDER
For the reasons stated, the Plaintiffs’ Motion for Summary Judgment is DENIED. Defendant’s Cross Motion for Summary Judgment is DENIED. Third-Party Defendant the Follett Company’s Motion for Summary Judgment is ALLOWED. Chutehall Construction Co., Ltd’s motion to strike is ALLOWEDin part and DENIEDin part, as set forth herein. Chutehall Construction Co., Ltd.’s Motion to Supplement Summary Judgment Record is ALLOWED. The Clerk will schedule a final pretrial conference for the earliest available date.

 Two motions address the composition of the record. Chutehall’s Motion to Supplement Summary Judgment Record proposes the addition of the second affidavit of Joseph Lydon, which clarifies statements in his first affidavit and in his inspection report (and proposal) submitted to the Downeys. The Downeys and Follett oppose the motion, on the ground that the submission is both late and irrelevant. The Court agrees that it is late, but perceives no prejudice, and considers it highly relevant to the material issue of whether Chutehall’s work conformed to applicable standards. In the exercise of discretion, the Court will permit the supplementation. Chutehall’s Motion to Strike addresses portions of Christopher Downey’s affidavit. The Court agrees with Chutehall that the following portions of the affidavit do not comply with Mass. R. 56(e), because they are hearsay or otherwise beyond the personal knowledge of the affiant: the last sentence of paragraph 5; the second and fourth sentences of paragraph 7; the second sentence of paragraph 8; and the references in paragraphs 10 and 11 to purported building code violations. The Court ■will allow the motion to strike with respect to those portions of the affidavit. The Court notes also that, although the remainder of the affidavit authenticates the inspection reports of Follett, Lydon, and SGH, it does not, as the Downeys appear to suggest, establish the foundation for admission of those documents as business records. The Court nevertheless considers the statements in those documents, because their authors have acknowledged and adopted them in deposition testimony (Follett and SGH) or by affidavit (Lydon).

 Grammatical errors are original. Emphasis is added.

 The counterclaim bears no label identifying a legal theory, but alleges that the Downeys brought their suit “maliciously and with an illegitimate ulterior purpose, i.e., in an effort to force Chutehall to pay for an upgrade with more expensive work to their roof and deck than they previously chose to have Chutehall perform.” The Court understands this to be a claim of abuse of process. Neither side has moved for summary judgment on this claim.

 The Court will address the issue of spoliation, raised by Chutehall, infra in connection with Chutehall’s motion for summary judgment.

 No evidence indicates that Follett actually made the statement attributed to it in Downey’s letter to Chutehall, “that the roofing workmanship was in fact poor and substandard.” Even if it did, that statement is clearly one of opinion, rather than fact.